20207

The STATE, Respondent, v. Jack Leland ALLEN, Appellant.

(224 S. E. (2d) 881)

Messrs. *Ernest B. Hinnant,* of Florence, *O. Harry Bozardt, Jr.,* of Orangeburg, and *Luke N. Brown,* of Ridgeland, *for Appellant,*

*Messrs. Daniel R. McLeod, Atty. Gen., Joseph R. Barker, Asst. Atty. Gen.,* of Columbia, and *T. Kenneth Summerford, Sol.,* of Florence, *for Respondent,*

April 9, 1976.

LITTLEJOHN, Justice:

Defendant Jack Leland Allen was tried in Florence County for the murder of Nancy Amaker. The jury found him guilty of willful, deliberate, and premediated murder and of murder during the commission of a kidnapping; defendant was sentenced to death pursuant to § 16-52, Code of Laws of South Carolina (1962) *as amended* (Supp. 1975).

Defendant has appealed his conviction and sentence, raising eleven questions for our determination. We have, *in favorem vitae,* carefully considered the arguments of counsel on all issues, whether the alleged errors were raised in the lower court or not.

The first three questions raised by defendant ask us to determine the constitutionality of Code § 16-52. The arguments asserted by counsel against the constitutionality of this statute are identical to those arguments which we recently rejected in *State v. Allen,* S. C., 222 S. E. (2d) 287, filed February 11, 1976. Reference is made to that opinion; no further discussion of these questions is warranted and the exceptions challenging the constitutionality of § 16-52 are overruled.

The remaining eight questions presented relate to alleged errors at the pretrial and trial stages of the proceedings. Specifically, he asserts the following prejudicial errors:

1. Failure to appoint counsel in Florence in violation of the Defense of Indigents Act;

2. Failure to grant defendant's motion for an inquest or probable cause hearing;

3. Requiring defendant to stand trial in Florence County when the proper venue was in Calhoun County;

4. Admission of defendant's improperly obtained oral confession;

5. The solicitor's cross-examination of defendant concerning details of prior crimes, and his suggestion of other crimes;

6. Failure to direct a verdict in defendant's favor on the charge of murder during the commission of a kidnapping;

7. The inflammatory closing argument of the solicitor; and

8. Failure to grant the mistrial when it appeared that the court's sequestration rule had been violated.

A review of the facts is necessary for a determination of the questions presented.

Defendant abducted Mrs. Nancy Amaker after abandoning a planned armed robbery in the town of St. Matthews, in Calhoun County. He forced her to ride with him, first, to Columbia, and then to an area which the State alleges was within Florence County. It was there that defendant shot Mrs. Amaker in the head. He asserts this was an accident; the State contends it was deliberate and in the commission of the crime of kidnapping. Defendant carried the body to a spot just inside the Darlington County line and abandoned it.

Defendant was eventually arrested in Arizona and returned to South Carolina. He was interrogated by South Carolina Law Enforcement Division agents, under the direction of Captain Leon Gasque. Gasque testified that he first talked with the defendant, advising him of his legal-*Miranda* rights, and that defendant agreed to make a written statement. Defendant also gave oral statements to the sheriffs of Florence and Darlington Counties. It was dur-

ing these oral statements that the defendant described the spot where the shooting occurred. Based on his description of the spot, it was concluded that Mrs. Amaker was shot in Florence County before her body was abandoned in Darlington County. At trial, the defendant admitted that he gave these statements, with one exception, voluntarily and that he was not coerced in any way. The exception relates to one sentence in the written statement. According to the statement, he said, "I pointed the gun at her head and told her to calm down." The statement further quotes him as saying, "She did not and I shot her." At the trial, the defendant testified that he did not say those words. He claimed that he told Captain Gasque that Mrs. Amaker became hysterical and when he attempted to subdue her, the gun discharged.

South Carolina Code § 16-52 reads in relevant part as follows:

*"Punishment for murder.*—Whoever is guilty of murder under the following circumstances shall suffer the penalty of death:

(1) Murder committed while in the commission of the following crimes or acts (a) rape; (b) assault with intent to ravish; (c) kidnapping; (d) burglary; (e) robbery while armed with a deadly weapon; (f) larceny with use of a deadly weapon; . . ..

(5) Murder is willful, deliberate and premeditated.
.  .  .."

. . .

The defendant was indicted by the Florence County Grand Jury on October 5, 1974, for willful, deliberate, and premeditated murder during the commission of a kidnapping and/or robbery or larceny with the use of a deadly weapon. Later that same day, he was arraigned before the circuit judge, who (since previously appointed counsel were not present) appointed the public defender of Florence County to represent the defendant. Trial was set for the

January term of court. No inquest or preliminary hearing had been held. In January, counsel moved for a preliminary hearing and inquest, which were denied, as was a motion to quash the indictment because of alleged improper venue in Florence County. The trial was continued to the March term, at which the defendant was found guilty by a jury.

We now proceed to consider the remaining questions presented by defendant.

■ Defendant contends that he was denied his rights under the Defense of Indigents Act, Vol. 15, Code of Laws of South Carolina, *as amended* (1975 Supp. p. 81), because he was not appointed counsel according to the procedure set forth in the Act. The contention is not borne out by the facts.

Prior to the arraignment in Florence, Attorney Luke Brown of Ridgeland (home of the defendant) and Attorney O. Harry Bozardt, Jr., public defender of Orangeburg County, which is in the judicial circuit wherein the abduction occurred, had been appointed to represent the defendant. They were not present in Florence at the time the State wished to proceed with the arraignment. Before proceeding with the arraignment, the judge appointed Attorney Ernest Hinnant, public defender for Florence County, "to assist the defendant and his other appointed lawyers, . . ." Mr. Hinnant's assistant public defender, Attorney DeBerry, represented the defendant at the arraignment. Prior to the arraignment, the defendant interrupted the court to state:

"Your Honor, if I may, I'd like to waive the necessity of having an attorney here at this point. You may appoint an attorney for me—I would like to have that done—but it isn't necessary that he be here now. I'd like to get this over with as quickly as possible."

The judge proceeded with the arraignment, and Mr. DeBerry and the defendant entered the most advantageous plea available to any defendant. It is not argued that some other

plea might have been more proper, and we can perceive of no prejudice to the defendant's rights. The fact that Mr. DeBerry had practiced law less than five years was irrelevant.

Next, the defendant alleges error by the trial court in failing to grant his motions for a preliminary hearing and/or inquest. We find this contention to be without merit.

In South Carolina, when a charge is initially made in an indictment by a grand jury (as here), the accused is not entitled, as a matter of law, to a preliminary hearing. The decision to grant such a hearing lies within the discretion of the trial judge. He may, upon a proper showing, refer the case to a magistrate, designated by him, so as to afford the accused the benefit of a preliminary investigation. *State v. Nesmith,* 213 S. C. 60, 48 S. E. (2d) 595 (1948).

We can find no fault with the trial judge's exercise of discretion in this case. There was no showing to the lower court requiring a preliminary hearing.

Next, defendant alleges error in the trial judge's refusal to quash the indictment because of improper venue in Florence County.

Article I, § 11, South Carolina Constitution, *as amended* (Supp. 1975), provides that no person shall be held to answer for a crime where the punishment exceeds two hundred dollars or imprisonment for thirty days, unless on a presentment or indictment of a grand jury of the county where the crime shall have been committed. We have held that the right of a party to be tried in the county where the crime was committed is jurisdictional. *State v. Wiggins,* 257 S. C. 167, 184 S. E. (2d) 697 (1971).

Defendant asserts that since an essential element in the State's case against him was the kidnapping of Mrs. Amaker in St. Matthews, which is located in Calhoun County, venue was proper in Calhoun County, only, and thus the

indictment by the Florence County Grand Jury was void. We do not agree.

In *State v. Gasque,* 241 S. C. 316, 128 S. E. (2d) 154 (1964), we stated that where some acts material and essential to the offense, and requisite to its consummation, occur in one county and some in another, the accused may be tried in either.

Defendant was indicted for the willful, deliberate and premeditated murder of Nancy Amaker and/or murder during the commission of a kidnapping, he was found guilty on both charges. We think sufficient evidence was presented to warrant the conclusion that Mrs. Amaker either died or was mortally wounded while in Florence County.

Although the defendant attacked the conclusion that Mrs. Amaker was shot in Florence County, he offered no conflicting evidence except that the body was found, just over the county line, in Darlington County. Considering the events as related by defendant and other witnesses, we do not think the fact that the body was found in Darlington County disproves that Mrs. Amaker was killed, or mortally wounded, in Florence County.

During the trial, Capt. Gasque introduced defendant's written statement. Additionally, he related certain oral statements made by defendant, which were not recorded. The defendant alleges error in the admission into evidence of the oral statements attributed to him by Capt. Gasque. Specifically, Capt. Gasque stated that defendant told him "he would have hidden the body better, but he heard a vehicle coming."

Defendant asserts that the State has not proved that these statements were voluntarily and knowingly made. This assertion is amply refuted by the testimony of defendant and Capt. Gasque. Capt. Gasque testified that he repeatedly warned defendant of his rights, and the defendant himself admits that his statements were freely and voluntarily made.

At the trial, he repeatedly professed not to recall exactly what his oral statements were. Whether Gasque and the other officers, who testified concerning defendant's oral statements, were accurate or truthful was a matter for the jury's determination, the trial judge having so found in accordance with *Jackson v. Denno,* 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. (2d) 908 (1964).

Next, defendant alleges error in the solicitor's cross-examination of defendant concerning the details of prior criminal activity.

Prior to taking the witness stand to testify on his own behalf, the defense presented four good-character witnesses from Jasper County, where he had lived for some time prior to the killing of Mrs. Amaker. When defendant took the stand, he proceeded to describe to the jury his past criminal activities, reciting many criminal acts in detail. His brush with the law dated back to truancy twenty-five years previous, when he was only nine years of age. He told the court that he stole an automobile when he was twelve; other offenses about which he testified involved repeated thefts, robberies, kidnapping and escapes. He contended, however, that he never harmed or injured anyone with a deadly weapon before the shooting of Mrs. Amaker. The gist of his testimony was to show to the jury that, though he was admittedly an habitual criminal, none of his nefarious acts were committed with the use of force, so as to harm any person.

On two occasions, he testified, however, that he had committed a physical battery, but neither with the use of a weapon. He testified that he struck, with his fist, an osteopath whose negligence, he contended, had caused the death of his mother. He also testified that he resisted arrest in Arizona by striking the arresting officer with his fist.

By presenting character witnesses, defendant placed his good character and general reputation in issue; by submitting evidence of his criminal past, with the admitted pur-

pose of establishing his propensity for nonviolence, defendant placed this specific character trait in issue.

On cross-examination, the solicitor questioned defendant about the numerous crimes for which he had been convicted, and then inquired concerning some four instances of misconduct, not the subject of a conviction.

The defendant contends that the solicitor's continued inquiry into the details of prior wrongful acts amounted to prejudicial error. From a review of the record of the solicitor's cross-examination, we do not find that his questions exceeded the bounds of permissible inquiry.

We recognize certain exceptions to the general rule that an accused's bad character may not be offered against him by the State. One exception is where the accused takes the stand and thus becomes subject to impeachment, like any other witness. The accused may thus be cross-examined about any of his past transactions tending to affect his credibility. *Taylor v. State,* 258 S. C. 369, 188 S. E. (2d) 850 (1972). Secondly, where the accused offers evidence of his good character, thereby putting his reputation in issue, he may be cross-examined on particular acts which manifestly bear reference to the trait of character covered by the charge in the indictment. *State v. Gibert,* 196 S. C. 306, 13 S. E. (2d) 451 (1941). This latter exception affords more latitude as to what acts may be the subject of inquiry.

These exceptions are subject to the limitation that where prior convictions or misconduct are appropriately brought out on cross-examination, the State may inquire only so far as to bring out the nature of the conviction or activity and may not go into details. *State v. Corn,* 215 S. C. 166, 54 S. E. (2d) 559 (1949) ; *State v. Gibert, supra.* Further, where particular acts, not the subject of conviction, are the subject of proper inquiry on cross-examination, should the defendant deny the commission of

these acts, he may not be contradicted. *State v. Gibert, supra.*

Thus, the solicitor had the right to cross-examine the defendant with respect to conduct which reflected on his credibility as a witness and on the specific character trait involved in the crime charged. We find from a review of the record that the solicitor's questions were within the permissible scope of inquiry.

We find, also, that with the exception of two instances, when the defendant denied on cross-examination that he had committed certain acts, the solicitor either ceased his inquiry or was admonished and stopped from inquiring further by the trial judge.

The two instances in which the solicitor went further than merely inquiring of the defendant as to whether he had or had not committed a particular act, involved the defendant's attacks on the osteopath and the arresting officer in Arizona. Both of these instances had been brought out on direct examination by defendant himself.

On cross-examination, the solicitor asked defendant if his attack on the osteopath had not actually required the osteopath to have 175 stitches taken. Defendant denied this. Further, the solicitor asked the defendant if, in fact, he had almost killed the officer in Arizona. Defendant denied this, also.

The solicitor's cross-examination of the defendant on the specific instances which he himself brought up and described on direct examination was not error. The solicitor was free to pursue cross-examination within the scope of the inquiry begun on direct examination. 98 C. J. S. *Witnesses* § 378 at 134-5 (1957), states the general rule as follows:

"[A]ny matter is a proper subject of cross examination which is responsive to testimony given on direct examination, or which is material or relevant thereto, and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness."

Further, at page 186 of 98 C. J. S. *supra,* § 401, it is stated:

"In general, accused may be cross-examined as to any matters pertinent or material to the issues in the case, or any matters concerning which he has testified, or to which he has referred, on his direct examination, or any matter as to which he has volunteered a statement, or any matter which may throw light on the testimony given by him on direct examination, and which is germane thereto; and cross-examination may be as searching and broad as the foundation of direct examination on which it rests."

If, in order to convince the jury that he was of a non- ▮ violent nature, it was relevant to testify on direct examination that he struck the osteopath and the arresting officer with his fist, it was not inappropriate for the solicitor to inquire whether, in fact, he had cut the osteopath and had almost killed the officer with a table. The State was not required to accept, without cross-examination, the defendant's version of what had happened on the two occasions.

Next, defendant alleges error in the trial court's fail- ▮ to direct a verdict in his favor on the charge of murder during the commission of a kidnapping. He argues that his only purpose in abducting Mrs. Amaker was to avoid arrest and he never intended to hold her for ransom or reward.

Code § 16-91, proscribing the crime of kidnapping, provides:

*"Kidnapping, etc.,*—Whiever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct, or carry away any other person by any means whatsoever *and hold such person for ransom or reward,* except when a minor is seized or taken by a parent thereof, shall be guilty of a felony and, upon conviction, shall suffer the punishment of life imprisonment unless sentenced for murder as provided in § 16-52." (Emphasis added.)

In *State v. Woods,* 189 S. Ct. 281, 1 S. E. (2d) 190 (1939), this Court had the opportunity to consider the forerunner of what is now Code § 16-91 (*see* Act of March 22, 1937, 40 St. at Large p. 137; § 16-91 Code of 1952) in reference to an issue quite similar to that presented in the instant case. In *Woods,* defendants were charged with murder of a prison guard whom they had seized during an attempted prison escape. Defendants had seized the guard and held him hostage in order to procure an automobile and to facilitate their escape. This Court held that the trial judge had not erred in charging the kidnap statute to the jury. The Court stated:

"We dare say that the exact circumstances above described were not in the minds of the law making body of this State when the 'kidnapping' Statute of 1937 was enacted into law, but the statute is sufficiently broad to cover such a situation. . . .

". . . [U]nder the circumstances of this case, it was the duty of the trial Court to advise the jury that if they believed from the evidence that there was a plan to seize and hold Captain Sanders in order to enable appellants to escape, and hold him as a hostage until escape was effected, then such act constituted kidnapping and was a felony."

Defendant frankly admits that his purpose in abducting and carrying away Mrs. Amaker was to avoid arrest. We conclude that this purpose fits within the meaning of the terms "ransom or reward" as they are used in Code § 16-91. The holding in *Woods* is conclusive on this point.

We should point out, also, that defendant was found guilty on the separate and distinct charge of willful, deliberate and premeditated murder.

Next, defendant alleges that the solicitor's inflammatory argument to the jury was prejudicial error.

Defendant complains of several instances of objectionable argument by the solicitor which, taken together, constitute reversible error.

He asserts that the solicitor referred to the jurors individually in violation of Circuit Court Rule 77, which forbids an attorney to refer to a juror by name or appeal to a juror personally. The record shows that the solicitor referred to the jurors collectively as "Mr." or "Madam Juror" and made no effort to talk with individual jurors.

Defendant complains that the solicitor repeatedly expressed his disbelief in the credibility of the defendant, in violation Disciplinary Rule 7-106(4). The record shows that the solicitor limited his comments to evidence that was in the record. We have consistently held that a solicitor has a right to state his version of the testimony and comment on the weight to be given such. *State v. Pitts,* 256 S. C. 420, 182 S. E. (2d) 738 (1971). And this certainly includes comment on the weight to be given the testimony of witnesses for defendant. *State v. Jernigan,* 156 S. C. 509, 153 S. E. 480 (1930).

Defendant further complains that the solicitor drew attention to the victim and her family, thus inflaming the jury's passion. While ordinarily reference to the victim's family is uncalled for and is not to be tolerated, the same must be evaluated in the context of all of the arguments, which are before the court and have been reviewed. Counsel for the defendant argued for a merciful verdict. The solicitor, in referring to the family, was commenting upon the consequences of the defendant's act. In the light of the argument of defense counsel, we cannot say that the argument of the solicitor was prejudicial so as to require a new trial.

Defendant also complains of the solicitor's argument that the jury should return the death penalty.

While it is improper for a solicitor to make comments, during his argument, which prevent the jury from arriving at their verdict by impartial deliberation, he may appeal to the jury to return the verdict which

he conceives it to be their duty to return under the evidence. 23A C. J. S. *Criminal Law* § 1107, at 203 (1961). In the instant case, the solicitor confined his argument to a legitimate recommendation concerning the punishment to be imposed.

This Court, on numerous occasions, has held that the duty of a solicitor is not to convict a defendant, but to see justice done. We have found closing arguments improper when they appealed to personal bias, or when calculated to arouse passion and prejudice. *State v. White,* 246 S. C. 502, 144 S. E. (2d) 481 (1965).

However, the burden of proving that an alleged improper closing argument entitles one to a new trial is upon defendant. Unless he establishes that the argument was so prejudicial as to deny him a fair trial, he will not prevail. *State v. Durden,* 264 S. C. 86, 212 S. E. (2d) 587 (1975).

All arguments, for both the State and the defendant, have been made a part of the record. We have reviewed the same and conclude that, taking them in context to each other, the solicitor's argument was not such as to constitute reversible error warranting a new trial.

The last error complained of by defendant relates to the alleged violation of the court-imposed sequestration of witnesses.

It appears that at the start of the trial, several witnesses, after completing their testimony, rejoined the remaining witnesses, who were sequestered, and some discussion took place among them. Considering the fact that the testimony of these few witnesses concerned solely the identification of the defendant in St. Matthews on the day he abducted Mrs. Amaker, a fact which defendant admitted, no possible prejudice resulted.

As is our custom in cases involving capital punishment, we have reviewed the entire record to determine if there is any reversible error in the trial of

the case, whether raised by exception or not. An independent search on our behalf reveals no error warranting a new trial.

For the reasons set forth, the verdict and sentence of the court below is

Affirmed.

LEWIS, C. J., NESS and RHODES, JJ., and JOSEPH R. Moss, Acting Associate Justice, concur.